UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DANIEL C. CARTER,

Plaintiff,

v.

WASHINGTON DEPARTMENT OF CORRECTIONS, ELDON VAIL, RONALD FRAKER, BRENT CARNEY, JAY A. JACKSON, JAMIE CALLEY,

Defendants.

No. C11-5626 RJB/KLS

**REPORT AND RECOMMENDATION**
**NOTED FOR: March 15, 2013**

Before the Court is the Motion for Summary Judgment of Defendants Eldon Vail, Ronald Fraker, Brent Carney, Jay Jackson, Jamie Calley, and the Washington Department of Corrections (DOC). ECF No. 38. Defendants served Plaintiff with a Notice consistent with *Woods v. Carey,* 684 F.3d 934, 935, 940-41 (9th Cir. 2012) and in accordance with the holding of *Rand v. Rowland,* 154 F.3d 952, 962-63 (9th Cir. 1998). ECF No. 39.

In response, Plaintiff Daniel C. Carter filed a Declaration.[1] ECF No. 42. On November 8, 2012, Plaintiff also filed a "Response to Defendant's Motion for Summary Judgment," which was not filed with the Court by the Plaintiff. A copy of Plaintiff's Response is attached to Defendants' reply. ECF No. 46-1, pp. 2-17. Defendants filed a reply and motion to strike portions of Mr. Carter's Declaration. ECF No. 46. Plaintiff filed a response in opposition to the motion to strike. ECF No. 50.

[1] The copy of Mr. Carter's Declaration filed with the Court appears to be unsigned. Nevertheless, the Court has considered portions of the declaration (as described more fully herein) because the lack of a signature may be easily remedied and it is anticipated that Mr. Carter would testify to its contents at trial.

Mr. Carter, a pro se prisoner who is currently incarcerated at the Stafford Creek Corrections Center (SCCC), alleged in his complaint that in 2010, when he was incarcerated at the Clallam Bay Corrections Center (CBCC), Defendants implemented Ramadan food service policies that violated his rights under the First Amendment (Freedom of Religion), Eighth Amendment (cruel and unusual punishment), Fourteenth Amendment (due process and equal protection), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"). ECF No. 9.[2]

Mr. Carter has subsequently withdrawn the following: (1) Fourteenth Amendment equal protection claims; (2) claims under RLUIPA, including those relating to Eid Ul-Fidr celebration; and (3) all claims against Defendants DOC and Eldon Vail. ECF No. 46-1, pp. 2-3. Therefore, the undersigned has recommended that these claims be dismissed with prejudice.

Having reviewed the motions, supporting declarations, and balance of the record, the Court recommends that Defendants' motion for summary judgment (ECF No. 38) be granted.

**MOTION TO STRIKE**

Defendants move to strike Mr. Carter's Declaration and supporting exhibits (ECF No. 42[3]) in their entirety on the grounds of relevance. ECF No. 46. However, Mr. Carter may testify to his religious beliefs and observances as these are relevant to the issue of whether Defendants infringed on those beliefs and observances. Thus, Defendants motion to strike on this ground is denied. The Court will consider Mr. Carter's testimony regarding his religious practices, beliefs, and interpretation of religious texts found in ¶¶ 1-41 of his Declaration.

---

[2] Similar claims filed by three other inmates relating to the 2010 Ramadan meals are pending in this Court. *Harry J. Whitman v. DOC, et al.*, C11-5457BHS/KLS; *Tony Smith v. DOC, et al.*, C11-5731BHS/JRC; *Marco Garnica v. DOC, et al.*, C12-5544RJB/KLS.

[3] The parties refer to the Declaration "Dkt. 41"; however, the Declaration is filed at ECF No. 42.

Alternatively, Defendants move to strike portions of the Declaration and exhibits on the grounds of inadmissible hearsay, opinion, and lack of personal knowledge. ECF No. 46, p. 2. Mr. Carter is not a doctor, nutritionist, or expert in nutrition, despite the training he received in the AHCC's introductory course in Basic Culinary Handling Practices. *See* ECF No. 42, pp. 9-10, ¶¶ 39, 40. Mr. Carter may testify to his personal knowledge and beliefs with regard to the food that was served to him and/or symptoms he allegedly suffered. He may also cite to learned treatises, however his extrapolations and attempts to summarize evidence, such as nutrient values calculated from food labels and/or other reports, are inadmissible hearsay and improper expert opinion. See ER 702 and 703; see also ER 1006 (summary charts based on inadmissible hearsay). Thus, Attachments A, B, and D to Mr. Carter's Declaration and statements contained in his Declaration which rely on these attachments are inadmissible hearsay and will not be considered. *See*, ECF No. 42, pp. 33-36, 38.

In addition, the Court finds as follows, with regard to specific paragraphs in the Declaration:

1) ¶ 42 - (Statements made to and by Chaplain Duncan). Chaplain Duncan's statements are hearsay because they are out of court statements presented for the truth of the matter asserted. However, the Court will consider the information contained in this paragraph as evidence that Plaintiff conveyed his concerns and complaints to the chaplain.

2) ¶¶ 46-47 – (Thurston County Case). The contents of this case are public record of which the Court may take note. Mr. Carter may also testify to his involvement in the case. However, Plaintiff lacks personal knowledge to testify to the reasoning of the Superior Court Judge's ruling on the motion for temporary injunction and that reference will not be considered.

In addition, the reason Mr. Whitman withdrew his complaint is based on hearsay and will not be considered.

3) ¶ 49 – (Caloric Value of 2010 Ramadan Bologna Fasting Tray). In this paragraph, Mr. Carter states that the 2010 Ramadan Bologna Fasting Tray was one of two meals, together with a snack, that were provided throughout the 2010 Ramadan fast. Based on his handwritten summary (Attachment A), he concludes that the meal consisted of only 1, 986 calories, 1,512 of which consisted of cookies, cakes, condiments, and bread. As noted above, Mr. Carter's opinion as to nutrient values and his handwritten summaries are inadmissible hearsay and improper expert opinion. *See* ER 702, 703, and 1006. The statements contained in this paragraph will not be considered.

4) ¶¶ 50-77 – (Contents of Ramadan Fast Trays). Mr. Carter may testify to the nature of the meals that he was served. He may also provide his lay opinion as to what was lacking from the food and his belief that the Ramadan meals were not moderate, balanced, and varied compared to various dietary guidelines. However, Mr. Carter is not an expert in nutrition and therefore, he may not assert an expert opinion as to whether the meals served were, in fact, nutritional or that by serving the meals, Defendants violated his Eighth Amendment rights. Mr. Carter's summaries of information are also inadmissible hearsay, as no proper foundation has been laid as to each item contained within the statistics. *See* Fed.R. Evid. 1006, which provides that contents of voluminous writings, records, or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary, or calculation. However, the information that is summarized must also be admissible. The Court cannot determine whether the underlying material is admissible as it has not been provided. Finally, as discussed more fully below, the record reflects that the summaries are based on outdated information.

5) ¶ 79 – (Last Sentence). Defendants argue that the last sentence in this paragraph contains an improper lay witness opinion under ER 701 and improper expert opinion under ER 702 and 703. In this paragraph, Plaintiff summarizes Defendants' claim that any mistakes made in packaging and assigning nutritional values to the food items were corrected before Ramadan began by supplementing the box meals with the supplemental snack. He then states "[a]ll of this is wrong." ECF No. 42, p. 21, ¶ 79. As noted above, Plaintiff may testify to his belief that any mistakes made in the Ramadan box meals were not timely corrected. However, he is not an expert in nutrition and therefore, he may not assert an expert opinion as to the packaging and assignment of nutritional values. In addition, to the extent that he relies on his handwritten summaries of nutritional information to make this conclusion, that conclusion is based on inadmissible hearsay and will not be considered.

6) ¶ 80 – (Summary of Jay Jackson's claim). Defendants argue that sentences beginning with "[h]ere, Jay Jackson, appears to be claiming…" must be stricken as improper lay and expert opinion, lack of personal knowledge, speculation, and a mischaracterization of the evidence. These objections go to the weight of the evidence rather than its admissibility. Plaintiff may testify to his understanding of the evidence.

7) ¶ 83 – (Problems with Meals). In this paragraph, Plaintiff states his opinion that the Defendants "never resolved the problem with the meals, rather they kept changing around the nutrition facts throughout the month. Besides the addition of the supplemental snack already mentioned, no other food was provided by the Defendants throughout the month." ECF No. 41, ¶ 83. Plaintiff may testify to what food he was provided during Ramadan. However, he is not an expert in nutrition and therefore, he may not assert an expert opinion as to the nutritional value of the meals. In addition, to the extent that he relies on his handwritten summaries of nutritional

information to make this conclusion, that conclusion is based on inadmissible hearsay and will not be considered.

8) ¶ 89 – (Grievance by Other Inmate). A copy of this grievance was produced by Defendants to Plaintiff in response to discovery requests. Although technically hearsay (the grievance contains out of court statements offered for the truth of the matter stated), the grievance may be considered as evidence of SCCC's response to inmate concerns about the Ramadan meals.

9) ¶¶91-108 – (Physical Symptoms and Causes). Mr. Carter may testify based on his personal knowledge regarding his physical symptoms. However, Mr. Carter is not a medical doctor or nutritionist and may not provide a medical or expert opinion on the cause of his symptoms or on whether the Ramadan meals were, in fact, nutritionally adequate.

10) ¶ 117 – (Devotional Acts of Worship). In this paragraph, Mr. Carter asserts that prayers performed during Ramadan require "energy and attention". He also cites to Mohammad Mazhar Hussaini in "Islamic Dietary Concepts and Practices" regarding the effects of prayer and fasting. Mr. Carter is qualified to testify as to his religious experiences during the 2010 Ramadan. However, the statements contained in this paragraph are inadmissible hearsay and will not be considered as evidence of what occurred during the 2010 Ramadan fast.

**FACTS[4]**

Daniel Carter has been a practicing Muslim since 2001. ECF No. 42, Declaration of Daniel C. Carter, p. 6, ¶ 20. Mr. Carter has been incarcerated for over eleven years and during each of those years prior to 2010, Mr. Carter participated in the Ramadan Fast and was provided

[4] Facts relating to the Eid Ul Fitr celebration marking the end of Ramadan are not included herein as Mr. Carter has withdrawn all claims relating to that celebration. ECF No. 46-1, pp. 2-3

three meals per day, including a hot meal in the evening. *Id.*, ¶¶ 21, 23. He claims that he never experienced any physical problems participating in the Ramadan Fast in the years prior to 2010. *Id.*, ¶ 26.

Mr. Carter states that in the early months of 2010 leading up to the Ramadan Fast that began on August 11, 2010, Defendants devised and enforced policies and procedures that changed the Ramadan meals. In particular, it was decided that the DOC would no longer provide hot meals to fast participants and that they would be given one meal per day. Mr. Carter states that he was privy to information relating to the formation and enforcement of the new DOC policies because he was part of CBCC's liaison group, as a representative of the Muslim prisoner community. *Id.*, ¶¶ 27-31. Mr. Carter states that he stayed informed of the developing policies and procedures as they were being drafted through regularly scheduled meetings in the months leading up to the Ramadan Fast of 2010. *Id.*, ¶ 35. In late May or early June 2010, Chaplain Duncan showed Mr. Carter and other liaison group members the list of food items that would be included in the two fasting trays, which were to be provided on alternate nights throughout the month of Ramadan. *Id.*, ¶ 36.

Mr. Carter and other members of the liaison group believed that the fasting trays proposed by the DOC were not of "sufficient nutritional value to sustain [himself] and other [participants] in the fast in good health for the entire month of Ramadan." ECF No. 42, Carter Decl., ¶ 40. On July 19, 2010, Harry Whitman, a fellow inmate, filed a motion for temporary restraining order in Thurston County Superior Court, Case No. 10-2-01754-0. *Id.*, ¶ 45. The motion was heard on August 9, 2010, when the Ramadan fast was at its end, thereby mooting the issue. *Id.*, ¶ 47. Mr. Carter claims that the injunction was denied, in part, because Defendant Jay Jackson supplied incorrect nutritional facts at the hearing. *Id.*, ¶ 47. According to Mr. Jackson,

the August 9, 2010 declaration he provided in that case was based on the nutritionals available at the time. It was not until the next day that Mr. Jackson found issues with the actual nutritional content of the Ramadan meals. The deficiencies were corrected and forwarded to food managers on August 10, 2010. *See* ECF No. 82 (Declaration of Jay Jackson), p. 2, ¶¶ 4-5 (Case No. 11-5457BHS).

Jay Jackson is Food Service Program Manager for the DOC. According to Mr. Jackson, prior to 2010, Ramadan meals consisted of a dinner hot meal and sack meals equaling breakfast and lunch calories. ECF No. 38-1, Exhibit 1 (Declaration of Jay Jackson), p. 1, ¶¶ 1, 3. The Ramadan dinner hot meal would typically be served after mainline (the standard meals served to the general offender population at a correctional facility). Serving the Ramadan hot dinner meal so that Ramadan participants received their meals after sunset incurred additional food service and custody staff time. *Id.* Some facilities would store the warm portion of the meal in a heated unit to maintain temperature, while other facilities provided an extra mainline, thereby occurring additional staff costs, including overtime. *Id.*, ¶ 4. According to Mr. Jackson, there is no nutritional difference between a cold meal and a hot meal. *Id.*, ¶ 5 n.2.

Brent Carney is the Dietary Services Manger of DOC. He is a certified dietitian in the state of Washington and obtained registered dietitian credentials from the Academy of Nutrition and Dietetics. ECF No. 38-1, Exhibit 2 (Declaration of Brent Carney), p. 1, ¶ 1. According to Mr. Carney, in 2009 DOC looked at providing Ramadan box meals for offenders who would be celebrating Ramadan in 2010, which would occur August 11, 2010 through September 9, 2010. *Id.*, p. 2, ¶ 6. Providing a Ramadan box meal that contained food items for a full set of meals eliminated any need for additional food service staffing and meal preparation outside of normal working hours, additional meal deliveries to segregation units, additional custody staff, and other

additional operational overhead. Overall, box meals would reduce costs and minimize the disruption to kitchen staff while allowing offenders to meet their nutritional needs. *Id.*

The use of box meals anticipated the issue of Ramadan moving towards the summer solstice. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 6. Every year the beginning of Ramadan moves forward roughly ten days. This creates an ever-increasing time period between mainline dinner and when the Ramadan hot meal would be served after sunset. This trend increases the burden on the DOC by extending the time it needs to have personnel available to staff the dining hall after-hours during Ramadan. Additionally this has the potential to interfere with prison operations as many correctional program opportunities occur after mainline. *Id*.

Mr. Jackson states that standardized box meals addressed offenders' complaints that Ramadan meals were different depending on where the offenders were housed. ECF No. 38-1, Exhibit 1 (Jackson Decl.), ¶ 7. Furthermore, because the box meal was cold, offenders would have greater flexibility on when they could consume their meal. Offenders could pick-up their box meals and take them back to either their cell or chapel to break their fast. Unlike the hot portions of meals that had to be eaten shortly after they were served, the cold meal could be consumed anytime during the evening. *Id*.

On October 28, 2009, Jay Jackson and Brent Carney attended a Food Managers Meeting at the Airway Heights Corrections Center to discuss the plan to introduce Ramadan box meals for 2010. It was planned that at the next meeting the possible food items that were to be included in the Ramadan box meals would be discussed. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 2, ¶ 8; Exhibit 2 (Carney Decl.), p. 3, ¶ 7.

On March 9, 2010 through March 10, 2010, another meeting was held to discuss the proposed food items that would be included in the Ramadan box meals. It was decided that two

different boxes would be offered every other day. The boxes would contain such items as cereal and powdered milk, fresh or dried fruit, breakfast coffee cake item, peanut butter and bread, Halal lunch meat with cheese, bread, condiments, dried dates to break the fast, and two fortified fruit drinks. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 9; Exhibit 2 (Carney Decl.), p. 3, ¶ 8. The food items for the box meals were selected using available Halal supplies, items not easily spoiled, and items not needing to be heated when the kitchens are closed and/or held in food warmers beyond the recommended storage guidelines. *See* ECF No. 38-1, Exhibit 2 (Carney Decl.), pp. 2-3, ¶ 6.

On March 11, 2010, Defendant Carney sent a rough draft of Ramadan nutritionals to Correctional Industries (CI) for input and review. ECF No. 38-1, Exhibit 2 (Carney Decl.), p. 3, ¶ 9. DOC uses software purchased through CI to perform nutritional analysis for menus. DOC staff enters the nutritional data into the CI software. The data entered into the CI software consists of recipes, products, and portion size for menu items. The final product is the nutritional analysis for each menu. *Id.*, ¶ 3. CI uses the Esha program for nutritional analysis of the foods it produces for the DOC. CI staff enter the nutritional data of CI foods into the Esha software by inputting the food product, recipe, and portion size to get the nutritional values for each item. *Id.*. ¶ 4. Occasionally, the CI software and Esha programs arrive at different nutritional values for a particular food item. When that occurs Defendant Carney works with CI to analyze the results and determine the final nutritional content for the food item. *Id.*, ¶ 5.

On March 22, 2010, Defendant Carney sent CI the finalized nutritional information for the two proposed Ramadan box meals. On May 22, 2010, Defendant Carney checked nutritionals for the Halal meats and the Kaiser Roll that were to be included in the 2010 Ramadan box meals and noticed that the software he used had overstated the calorie content for

the Halal meats and the Kaiser Roll. Defendant Carney corrected the inaccuracy and notified Jay Jackson of the change to the nutritional information. *Id.*, pp. 3-4, ¶¶ 10-12.

On August 10, 2010, the day before the start of Ramadan, a CBCC staff member notified Defendant Jackson that some offenders had raised concerns about the meals, specifically about the calorie content that was to be provided. ECF No. 38-1 (Jackson Decl.), p. 3, ¶ 10. The staff member sent copies of the box meal labels to Defendant Jackson. *Id.; see also id.*Attachment A. After he reviewed the box meal labels, Defendant Jackson realized that the calories indicated on the labels did not reflect the original caloric values that had been planned for the Ramadan box meals. *Id.*, p. 3, ¶ 11.

Defendant Jackson contacted CI to verify that the lower calorie box meals delivered to CBCC were supplied to all facilities and were not just an anomaly. He was told that all facilities received the lower calorie box meals and that CI would re-enter the nutritionals into their system. Additionally, Defendant Jackson discovered the meals' nutritional label misstated the calories because the meals contained more calories than were indicated on the labels. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 3, ¶ 12. When CI re-entered the nutritional information, it turned out that the box meals contained additional calories totaling 1920 calories. *Id.*; *see also id.* Attachment B; Exhibit 2 (Carney Decl.), pp. 3-4, ¶¶ 12-13. Because the calorie total was still short, Defendant Jackson contacted Defendant Carney and they discussed how to supplement meals with additional calories to meet the caloric goals defined in DOC policy. *Id.*, Exhibit 1 (Jackson Decl.), p. 4, ¶ 13; Exhibit 2 (Carney Decl.), p. 4, ¶ 13.

On August 10, 2010, Defendant Jackson sent the following email to all food service managers:

> This is important information about Ramadan and needs to be implemented today to ensure nutritional compliance for those participating in Ramadan.
>
> The original Ramadan box nutritional information was incorrect, the actual calories for the Ramadan box is less than 2600 calories and additions will need to be made to make up for these calories.
>
> The list of items contained in the box is correct with the exception of one fortified drink packet is included instead of two and the nutritional information on the Ramadan box is incorrect, both of these items will be corrected on future boxes as they are made for future deliveries. Review future deliveries for updated information.
>
> To account for the calories the following additions must be made:
>
> - Male and female offenders participating in Ramadan should receive one fortified drink until new Ramadan boxes arrive with two packets, at that time discontinue the second packet provided by Foodservice because the second milk will be in the box.
> - Male offenders will need to be provided one of the following options each day as an addition to the Ramadan box. These options can be packed in a paper bag.
>   1. One blue snack and one yellow snack or the equivalent – two peanut butter packets, one jelly packet, two slices bread or another two bread item and four packets of crackers.
>   2. One piece fruit, two packets of cookies, two slices of bread or equal, one salad dressing, and one mustard.

ECF No. 38-1, Exhibit 1 (Jackson Decl.), Attachment C, p. 16.

With the supplements provided with the tray lunch, the average daily calories provided during Ramadan was 2724 calories. *Id.* (Jackson Decl.), p. 4, ¶ 16.

In response to Defendant Jackson's email of August 10, 2010, CBCC's food service manager Jamie Calley decided to implement the second option outlined in Mr. Jackson's email because the food items were readily available to CBCC. ECF No. 38-1, Exhibit 3 (Declaration of Jamie Calley), p. 2, ¶¶ 5-6. The first Ramadan box meal was handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin. On that day, the offenders observing

Ramadan would have received their standard three meals in addition to the Ramadan box meal for August 11, 2010. *Id.*, p. 2, ¶ 7. To the best of Defendant Calley's recollection, the supplemental food items were provided at the first Ramadan meal and all box meals contained the full caloric value as set forth by Defendant Jackson and Defendant Carney. Defendant Calley believes that the longest delay in providing the supplemental food items would have been one day and all offenders observing Ramadan would have received their full box meals by August 11, 2010 for consumption on August 12, 2010. *Id.*, pp. 2-3, ¶ 8.

On August 11, 2010, Defendant Carney sent Defendant Jackson the nutritional information for the additions to the Ramadan box meals. ECF No. 38-1, Exhibit 2 (Carney Decl.), pp. 4-5, ¶ 16. Defendant Carney noticed that the nutritional information for the Halal meat was incorrect and he updated the nutritional information. Thus, the bologna Ramadan box meal with the supplements provided 2698 calories and the salami Ramadan box meal with the supplements contained 2749 calories. *Id.*

During Ramadan 2010, Mr. Calley met with some offenders who stated objections to the box meals because they contained too many carbohydrates and sugars. The offenders were also upset that they were no longer given a hot meal. According to Mr. Calley, the offenders were not objecting to the overall caloric content of the box meals. Mr. Calley states that he emailed the offenders' concerns to Brent Carney, who inquired whether the box meals included the correct amount of Halal meat. Mr. Calley states that the amount of Halal meat provided was not an issue for the inmates. ECF No. 38-1, Exhibit 3 (Calley Decl.), p. 3, ¶ 9.

In an email dated August 13, 2010, Mr. Calley notified Jay Jackson, Brent Carney, and others, that there "has been a lot of complaining here about the nutritional content of the Ramadan meals. Several offenders who are participating have approached me about the high

level of carbs and sugar in the meals." ECF No. 9, Exhibit D, p. 59. In a grievance dated August 25, 2010, Mr. Carter complained that the prepackaged meal he received on August 11, 2010 contained only 1770 calories and contained very little fiber or protein and an "overwhelming amount of sugar and starch." ECF No. 9, Exhibit F, p. 71. In response, Mr. Carter was told that concerns regarding "the caloric content of the Ramadan meal box have been addressed. To ensure standards are met, supplemental items will be provided." *Id.* In a grievance written on August 18, 2010, Raymond Bell, an inmate at SCCC, wrote that his caloric intake during Ramadan was insufficient. ECF No. 42 (Carter Decl.), Attachment F. In response, he was told that changes would be made statewide to prevent reoccurrence next year with the food supplier and that SCCC had recently changed the menu to two meals to ensure nutritional standards are met. *Id.*

Mr. Carter claims that the Ramadan Fasting Tray he received on August 10, 2010, contained 1,986 calories and contained no vegetables, insufficient amounts of grains, meat, milk, oils, fruit, fiber, and potassium, and a "toxic" level of sodium. ECF No. 42 (Carter Decl.), pp. 11-2, ¶¶ 49-51. Mr. Carter claims that the Ramadan Fasting Tray and supplemental snack he received on August 11, 2010, contained 2,504.5 calories and contained no vegetables, insufficient grains, meat, milk, oils, fruit, fiber and potassium, and "toxic" levels of sodium. *Id.*, p. 12, pp. 53-55. According to Mr. Carter, this last tray was the meal provided throughout the month of Ramadan in 2010. *Id.*, p. 12, ¶ 53. The nutritional values attributed to these trays by Mr. Carter is based, according to him, on information provided in the "Ramadan Specific Menu Nutrient Analysis Report" included in Jay Jackson's declaration filed in the Thurston County Superior Court case. According to Mr. Jackson, however, the declaration he provided in that case was based on the nutritionals available at the time. It was not until the next day, that Mr.

Jackson found issues with the actual nutritional content of the Ramadan meals. The deficiencies were corrected and forwarded to food managers on August 10, 2010. *See* ECF No. 82 (Declaration of Jay Jackson), p. 2, ¶¶ 4-5 (Case No. 11-5457BHS).

Mr. Carter states that during the 2010 Ramadan Fast, he was 26 years old, was physically active, and weighed over 160 pounds. He claims that, according to USDA's Dietary Guidelines for Americans, he should have been receiving 3,000 calories per day, 38 grams of fiber, 4.7 grams of potassium, and only 1.5 grams of sodium. ECF No. 42 (Carter Decl.), p. 16, ¶¶ 64-68.

According to medical chart notes and a report attached to his complaint, Mr. Carter was seen in CBCC medical by Dr. Clifford J. Johnson on August 19, 2010, complaining of diarrhea (for three days previously), constipation, headache, vertigo, and some weakness. ECF No. 9, Exhibit G, pp. 80-81. In his report, Dr. Johnson states: "He is fasting with Ramadan and is aware that this might be part of the problem." *Id.*, p. 81. Mr. Carter was given a 30 ml container of Milk of Magnesia. *Id.*

Mr. Carney states that the estimated energy or caloric requirement is defined as the amounts of energy that need to be consumed by an individual to sustain a stable body weight in the range desired for good health. The Dietary Reference Intakes for estimated energy requirements for men is based on their age, physical activity level and their body weight. These estimated caloric requirements vary widely. The energy requirement for an average thirty year old male ranges from 1850 calories a day for a lean male with sedentary physical activity level, to 3200 calories a day for a heavier male with an active physical activity level. ECF No. 38-1, Exhibit 2 (Carney Decl.), p. 22, ¶¶ 17.

A mainline meal provides an average of 2830 calories per day to meet DOC's recommended caloric guidelines for mails. DOC's guidelines for mainline meals for males are

based on a range of between 2700 and 3000 calories per day. ECF No. 38-1, Exhibit 2 (Carney Decl.), p. 5, ¶ 18; *see also id.*, Attachments A and 1. The range was set because actual daily calories of meals may vary plus or minus 300 calories per day and because the caloric range was made to meet the need of the diverse male inmate population. *Id.* According to Mr. Carney, the calorie level for Ramadan meals was set at 2700 calories per day to stay within DOC guidelines and was well above USDA Dietary Reference Intake recommendations. *Id.*

**SUMMARY JUDGMENT STANDARD**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth

specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001). This is true even when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

## DISCUSSION

### A. Eighth Amendment

Mr. Carter alleges that the Defendants restricted his 2010 Ramadan meals to one 1700 calorie box meal per day that was grossly nutritionally deficient. He argues that this constituted an unnecessary and wanton infliction of pain and punishment. ECF No. 9, pp. 25-26.

Inmates alleging Eighth Amendment violations based on prison conditions must demonstrate that prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995). Prison officials display a

deliberate indifference to an inmate's well-being when they consciously disregard an excessive risk of harm to the inmate's health or safety. *Farmer*, 511 U.S. at 838-40; *Wallis*, 70 F.3d at 1077. The Eighth Amendment standard requires proof of both an objective and a subjective component. *Hudson v. McMillian*, 503 U.S. 1 (1992). If either of these components is not established, the court need not inquire as to the existence of the other. *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

First, the deprivation alleged must objectively be sufficiently serious, resulting in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834(*quoting Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). In proving the objective component, an inmate must establish that there was both some degree of actual or potential injury, and that society considers the [acts] that the plaintiff complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly [to those acts]. *Helling*, 509 U.S. at 36; *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Second is the subjective component that the prison official possesses a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834-36. With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component requires proof that the official was: (1) aware of the facts that would lead a reasonable person to infer the substantial risk of serious harm; (2) actually made the inference that the substantial risk of serious harm to the plaintiff existed; and (3) knowingly disregarded the risk. *Id.*; *see also Farmer*, 511 U.S. at 844.

With regard to food, the courts have concluded, "the Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th. Cir.1993) (citation omitted). Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* (*quoting Hudson v. McMilliam*, 503 U.S. 1 (1992)). Although the Ninth Circuit has provided no guidance on the quantity of prisoner food necessary to pass constitutional muster, other courts have established guidelines. *See, e.g.*, *Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir.1986) (finding two meals a day sufficient if nutritionally and calorically adequate); *see also Sostre v. McGinnis*, 442 F.2d 178, 186, 193–94 (2d Cir.1971) (finding diets of 2,800 to 3,300 calories per day constitutionally adequate), *cert. denied*, 404 U.S. 1049 (1972); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir.1982) (finding one meal a day for 15 days, where the meal contained 2,000–2,500 calories and was sufficient to maintain health, constitutionally adequate).

The record reflects that Defendants made mistakes in the packaging and calculations of the 2010 Ramadan box meals, but the errors were corrected prior to or at the start of Ramadan. For example, on August 10, 2010, after he reviewed labels of both Ramadan box meals, Defendant Jackson realized that the calories indicated on the labels did not reflect the original caloric values that had been planned for the Ramadan box meals. ECF No. 38-1 (Jackson Decl.), p. 3, ¶¶ 10-11; *id.* Attachment A. After the nutritional information was re-entered, it was discovered that the meals actually contained more calories than what was reflected on their labels, but that at 1920 calories, the caloric level was still too low. *Id.* (Jackson Decl.), p. 3, ¶ 12. On the same day, Mr. Jackson notified all food service managers that the actual calories for the "Ramadan box is less than 2600 calories and additions will need to be made to make up for these

calories." Mr. Jackson's email contained detailed instructions as to how the food service managers should account for the calories, including providing offenders with one of two options of brown bag snacks in addition to the Ramadan box. ECF No. 38-1, Exhibit 1 (Jackson Decl.), Attachment C, p. 16. With the supplements provided with the tray lunch, the average daily calories provided during Ramadan was 2724 calories. *Id.* (Jackson Decl.), p. 4, ¶ 16.

According to CBCC's food service manager Jamie Calley, the first Ramadan meal was handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin. On that day, the offenders observing Ramadan would have received their standard three meals in addition to the Ramadan box meal for August 10, 2010. On August 11, 2010, the Ramadan participants would have received the Ramadan box meal and the supplemental food items described in the second option in Mr. Jackson's August 10, 2010 email. Thus, there was only a one day delay in providing the supplemental food items needed to provide the inmates with a meal containing the full amount the average daily calories. ECF No. 38-1, Exhibit 3 (Calley Declaration), p. 2, ¶¶ 6-8. According to Mr. Jackson, the average daily amount of calories provided during Ramadan was 2724. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 4, ¶ 16.

According to Mr. Carter, the first Ramadan meal he received contained only 1,986 calories and was otherwise nutritionally deficient because it contained no vegetables, insufficient amounts of grains, meat, milk, oils, fruit, fiber, and potassium, and a "toxic" level of sodium. ECF No. 42 (Carter Decl.), pp. 11-2, ¶¶ 49-51. Mr. Carter claims that the Ramadan Fasting Tray and supplemental snack he received on August 11, 2010 contained 2,504.5 calories and was otherwise nutritionally deficient because it contained no vegetables, insufficient grains, meat, milk, oils, fruit, fiber and potassium, and "toxic" levels of sodium. *Id.*, p. 12, pp. 53-55.

According to Mr. Carter, this last tray was the meal provided throughout the remainder of the 2010 Ramadan fast. *Id.*, p. 12, ¶ 53.

As noted above, however, the nutritional values attributed to the meals by Mr. Carter is based on information that was corrected the next day, August 10, 2010, by Defendant Jackson. The new information was forwarded to all of the food managers that same day. *See* ECF No. 82 (Declaration of Jay Jackson), p. 2, ¶¶ 4-5 (Case No. 11-5457BHS).

Moreover, even if it is assumed for purposes of this motion only, that Mr. Carter's caloric calculations are in fact correct and that the meals contained no vegetables, insufficient grains, meats, milk, oils, fruit, fiber and potassium, and too much salt, Mr. Carter has failed to show a constitutional violation. According to his figures, Mr. Carter consumed 1,986 calories on one day and 2,504.5 calories per day for the remainder of the month of Ramadan.

According to Mr. Carney, the consumption of 1900 calories for one day would not cause any significant health issues. ECF No. 38-1, Exhibit 2, at pp. 22-23, ¶¶ 19-20. The health ramifications of consuming 1900 calories would result in no more than two pounds weight loss per week or approximately 8 pounds of weight loss during the 30 days of Ramadan based on scientific evidence of weight loss. *Id.* The record reflects that Mr. Carter was provided with meals and supplements with average daily calories of 2724. ECF No. 38-1, Exhibit 1 (Jackson Decl.), p. 4, ¶ 16. Mr. Carter provides no competent evidence to dispute this fact.

Mr. Carney alleges that he suffered hunger headaches, dizziness, nausea, stomach cramps, constipation, diarrhea, lethargy, listlessness, and lost 7 pounds which required medical attention. ECF NO. 9, p. 24. The record reflects that he visited the doctor on one occasion during the 2010 Ramadan and at that time complained that he had suffered three days of diarrhea and that he was presently suffering from constipation. The doctor gave him some Milk of

Magnesium. ECF No. 9, Exhibit G, pp. 80-81. Mr. Carter also complained that he was suffering from headaches, vertigo, and some weakness. Dr. Johnson noted that Mr. Carter was fasting and that he was aware that the fasting might be part of the problem. *Id.*, p. 81. There is no further medical evidence in the record.

Additionally, the record reflects that Mr. Carter had access to and in fact bought items from the offender store during the Ramadan celebration. ECF No. 38-2, Exhibit 4 (Stubbs Decl.), Attachment A. Mr. Carter admits that he purchased these items, but states that he was saving the items for the end of Ramadan when he would break his fast with other inmates. ECF No. 42, pp. 29-30, ¶¶ 109-111. Regardless of whether Mr. Carter consumed these items during Ramadan or after, it remains undisputed that he had access to additional items if he felt hungry.

Mr. Carter must also provide admissible evidence that the Defendants acted with deliberate indifference tantamount to criminal recklessness. *See Farmer*, 511 U.S. at 836. A "prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 836. In addition, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id*., at 844.

The record reflects that Defendants acted with the intent to provide Mr. Carter and other Ramadan participants with the proper nutrition and calories during Ramadan in 2010. They corrected the caloric values of the Ramadan meals and when that was still insufficient, they added supplements to the meals to ensure that the goal of 2700 average calories was met. Mr.

Carter provides no competent summary judgment evidence to the contrary. Although he is unhappy that the Ramadan meals are not "nutritionally balanced", he has no Eighth Amendment right to meals of his choice. Rather, his right extends to food that is adequate to maintain his health. *LeMaire*, 12 F.3d at 1456. He has no constitutional right to be served a hot meal. *See., e.g., Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir. 1977). There is no medically competent evidence indicating that the food provided to him during Ramadan of 2010 was inadequate to maintain his health. Even assuming that Mr. Carter lost 7 pounds during the 2010 Ramadan fast, the evidence presented here indicates that his daily caloric needs were being met. There is no evidence that he sought medical treatment for the weight loss or indeed that the weight loss posed an immediate danger to his health and well being.

Viewing the foregoing evidence in the light most favorable to Mr. Carter, the undersigned concludes that he has failed to raise a genuine issue of material fact to establish a serious medical need based on his consumption of the food provided during the 2010 Ramadan fast. Accordingly, Mr. Carter's Eighth Amendment claim should be dismissed.

**B. Plaintiff's Claims Under RLUIPA**

Mr. Carter has withdrawn his claims under RLUIPA. ECF No. 46-1, p. 3. Therefore, the undersigned recommends that these claims be dismissed with prejudice.

**C. First Amendment Claim (Free Exercise of Religion)**

In order to establish a First Amendment violation, Plaintiff "must show that [defendant] burdened the practice of [his] religion, by preventing [him] from engaging in conduct mandated by [his] faith, without any justification reasonably related to legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987) (footnote omitted)). "In order to reach the level of a constitutional violation, the

interference with one's practice of religion 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.'" *Freeman*, 125 F.3d at 737 (citing *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987)). However, a prison official's negligent or accidental interference with an inmate's ability to exercise his religious beliefs does not state any claim actionable under § 1983. *Lovelace v. Lee*, 472 F.3d 174, 194 (4th Cir. 2006).

As a key element of a free exercise claim, under either the First Amendment (as well as RLUIPA), a plaintiff must demonstrate that in taking a specific action, prison officials knowingly placed a substantial burden on his ability to practice his religious beliefs. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) ("[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" are insufficient to state a claim under Free Exercise Clause); *Lovelace*, 472 F.3d at 187 (defining "substantial burden" to equate with Supreme Court's definition of that phrase for First Amendment claims as an official action that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs") (omitting citations). Officials' accidental or negligent actions that impinge to some degree on an inmate's religious practice are insufficient to support an actionable constitutional claim or RLUIPA claim. *Id.* at 194. As the United States Supreme Court has noted: "We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 848-849 (1998).

**(1) Intentional Act to Substantially Burden Religion**

To prevail on his First Amendment claim, Mr. Carter must demonstrate that in taking a specific action (*i.e.*, failing to provide him with a nutritional meal), prison officials *knowingly* placed a substantial burden on his ability to practice his religious beliefs. The record does not support such a claim. First, as discussed above, the record does not reflect that Mr. Carter's nutritional needs were not being met.

Further, Mr. Carter has not shown that he was substantially burdened in the practicing of his religion. For example, he does not complain that he was not allowed to participate in Ramadan, not allowed to pray or read the Qur'an, or that he was in any other way prevented from participating in his religious activities. Instead, Mr. Carter alleges that the Ramadan 2010 policy "substantially diminished the qualitative spiritual experience of Ramadan, prevented [him] from or otherwise distracted [him] from the spiritually uplifting aspects of the Ramadan observance. . . ." ECF No. 9, p. 25. Mr. Carter states that because he was hungry and had less energy, he was unable to fully participate in devotional acts of worship that accompany the Ramadan fast, including meditation, reciting the Qur'an, and additional prayers. ECF No. 42 (Carter Decl.), pp. 30-31.

Viewing the foregoing in the light most favorable to Plaintiff, the undersigned concludes that Mr. Carter has failed to raise a genuine issue of material fact as to his claim that the Ramadan 2010 policies and meals burdened the practice of his religion. As noted above, the evidence does not support Mr. Carter's characterization of the amount of calories in the Ramadan meals or the effect of those calories. Moreover, if he was still hungry during the fast, he had access to additional food. *See,e.g., Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810-12 & n. 8 (8th Cir. 2008) (prison's meal plan regulations did not substantially burden Muslim

inmate's free exercise rights where inmate had access to only vegetarian entrees and some of those entrees he had to pay for himself).

Based on the foregoing, the undersigned finds that Mr. Carter has failed to meet his burden to show that Defendants placed a "substantial burden" on his ability to practice his religion by implementing the 2010 Ramadan meals. Accordingly, Defendants are entitled to summary judgment on this claim.

**E. Fourteenth Amendment Claims**

**1) Due Process**

The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Plaintiff argues that he has never received notice that the Defendants intended on giving him less calories and nutrients as a part of the Ramadan diet than he would have received had he not been fasting. ECF No. 46-1, p. 15.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). State statutes and prison regulations may grant prisoners liberty interests sufficient to invoke due process protections. *Meachum v. Fano*, 427 U.S. 215, 223–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). However, the Supreme Court has significantly limited the instances in which due process can be invoked. Pursuant to *Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a prisoner can show a liberty interest under the Due Process Clause of the Fourteenth Amendment only if he alleges a change in confinement that imposes an "atypical and significant

hardship ... in relation to the ordinary incidents of prison life." *Id.* at 484 (citations omitted); *Neal v. Shimoda*, 131 F.3d 818, 827–28 (9th Cir.1997).

Therefore, to establish a due process violation, Plaintiff must first show the deprivation imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. *Sandin*, 515 U.S. at 483–84. Plaintiff must allege "a dramatic departure from the basic conditions" of his confinement that would give rise to a liberty interest before he can claim a violation of due process. *Id.* at 485; *see also Keenan v. Hall*, 83 F.3d 1083, 1088–89 (9th Cir.1996), amended by 135 F.3d 1318 (9th Cir.1998).

Mr. Carter states merely that he was "entitled to receive notice and did not receive notice" of a decrease in his caloric and nutritional intake. There is no evidence to suggest that any changes in Mr. Carter's diet were of such a "dramatic departure from the basic conditions" of his confinement that would give rise to a liberty interest. In addition, Mr. Carter states in his declaration that he was in fact kept informed of DOC's developing policies and procedures that led to the 2010 changes in the Ramadan Fast diet during weekly meetings in the months leading up to the 2010 Ramadan Fast. ECF No. 42, Carter Declaration, ¶¶ 32-36. Therefore, even if he were entitled to "notice", it appears that he received it. Finally, the record reflects that Mr. Carter received food adequate to maintain his health, which is all that the Eighth Amendment requires. *Hoptowit*, 682 F.2d at 1246; *LeMaire*, 12 F.3d at 1456; *Keenan v. Hall*, 83 F.3d at 1091.

Mr. Carter has failed to allege a liberty interest, and thus, has failed to state a due process claim. The undersigned recommends that this claim be dismissed.

**2) Equal Protection**

Mr. Carter has withdrawn his claim relating to any violation of the equal protection clause of the Fourteenth Amendment. ECF No. 46-1, p. 3. Therefore, this claim may be dismissed.

**F. Failure to Allege Personal Participation**

Defendants argue that Plaintiff's claims against Defendants Vail, Fraker, and Jackson should be dismissed for failure to allege their personal participation. Mr. Carter has withdrawn his claims against Defendant Vail (ECF No. 46-1, p. 3) and therefore, Defendant Vail may be dismissed from this suit. As to Defendants Jackson and Fraker, the Court finds that Mr. Carter sufficiently alleged their personal participation.

In order to state a civil rights claim, a plaintiff must set forth the specific factual basis upon which he claims each defendant is liable. Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. Monell v. Dept. of Soc. Serv. Of New York, 436 U.S. 658, 694 n.58 (1978); Padway v. Palches, 665 F.2d 965, 967 (9th Cir. 1982). Rather, each defendant must have personally participated in the acts alleged. Id. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor, 880 F.2d at 1045. Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss. Peña v. Gardner, 976 F.2d 469, 471 (9th Cir. 1992).

As noted above, Defendant Jackson was intimately involved in the process of implementing the 2010 Ramadan fasting trays, ensuring caloric compliance, and ordering that supplements to the meals be provided. Plaintiff also alleged that Defendant Fraker personally

participated when he sent an email to all DOC superintendents, the chaplain, and Defendant Calley, outlining the procedures for the Ramadan 2010 events at CBCC. ECF No. 9, p. 11.

As discussed above, however, Plaintiff's claims against Defendants Fraker and Jackson may be dismissed because Mr. Carter has failed to show that they violated his constitutional rights. Defendant Vail may also be dismissed from the action as Mr. Carter has withdrawn his claims against Defendant Vail.

**G. DOC is Not a Person Under 42 U.S.C. § 1983**

Mr. Carter has withdrawn his claims against the DOC. ECF No. 46-1, p. 3. Therefore, the DOC may be dismissed as a party.

**H. Qualified Immunity**

Under the doctrine of qualified immunity, prison officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Prison officials are protected by qualified immunity unless they violate clearly established law of which a reasonable person would have known. *Id.*

A civil rights plaintiff opposing a claim of qualified immunity must establish the existence of a constitutional violation, clearly established law to support the claim, and that no reasonable official could believe their conduct was lawful. *Pearson v. Callahan*, 555 U.S. 223 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). The test for qualified immunity is an objective test requiring the plaintiff to prove a reasonable official could not believe his actions were constitutional. *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

As the Court has concluded that Mr. Carter has failed to raise material issues of fact relating to his constitutional claims, it is not necessary to address this issue.

**CONCLUSION**

Based on the foregoing, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 38) be **GRANTED;** and, that all of Plaintiff's claims against Defendants be **dismissed with prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **March 15, 2013**, as noted in the caption.

**DATED** this 27th day of February, 2013.

Karen L. Strombom
United States Magistrate Judge